**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|   |   |
|---|---|
| : | |
| TURI L. REDDICK,  : | |
| : | Civil Action No. 12-7875 (SDW) |
| Petitioner,  : | |
| : | |
| v.  : | **OPINION** |
| : | |
| CHARLES WARREN, et al.,  : | |
| : | |
| Respondents.  : | |
| : | |

**WIGENTON**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Turi L. Reddick ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court conviction (ECF No. 1). Respondents filed a response to the petition (ECF No. 17), to which Petitioner has replied. (ECF No. 22). For the following reasons, this Court denies the petition and no certificate of appealability shall issue.

## I.  BACKGROUND

Petitioner, Turi Reddick, brings this petition challenging his July 2003 conviction for, *inter alia*, robbery, reckless manslaughter, and felony murder. The New Jersey Appellate Division summarized the factual premise on which Petitioner's conviction rests as follows:

> Mary Lou Nolan died from a gunshot wound. The shooting led to the charges against [Petitioner], and his two codefendants, Shakore Collins, also known as Chubbs, and Shane Burns.[]
>
> The following facts were developed at trial. On the evening of February 9, 2002, Michael Nolan was asleep upstairs in his home at 220 East Fifth Avenue in Roselle. His wife, Mary Lou Nolan,

was downstairs on a couch watching television with the couple's grandsons.  Michael Nolan awoke to the sound of breaking glass and his wife's cry that she had been shot.  He found her collapsed and bleeding on the stairs.  He ran into the kitchen and dialed 911. His grandchildren remained on the couch asleep and unharmed. Michael Nolan's stepson, Michael Dixon, also lived in the house, but . . . was not home.  Prior to the shooting, Dixon had been convicted of selling marijuana.

When members of the Roselle Police Department responded soon after the 911 call, they observed shattered glass from the interior front door lying on the floor in the house's vestibule.  Mary Lou Nolan was lying near the vestibule door bleeding profusely from a gunshot wound to her right shoulder.  Burn marks and powder residue surrounded the wound.  The police recovered shotgun projectiles from inside and around the fireplace and in one of the couch cushions.

Mary Lou Nolan was transported to the hospital where she died.  The medical examiner testified that the cause of her death was a shotgun wound to her right anterior chest; she was shot at close range, from an approximate distance of one foot.

[Petitioner] gave a statement to the police that was read at trial by Sergeant Carl Riley of the Union County Prosecutor's Office.  [Petitioner] said that on the evening of the shooting, he was with Shakore Collins and Shane Burns.  [Petitioner] drove himself and Burns to pick up Collins outside of his home.  Prior to picking up Collins, [Petitioner] learned of a plan to rob the Nolan residence. According to defendant's statement,

> The plan was to go to the house, not to hurt anybody.  But they wanted money out of the situation and they said there was a lot of money there.  I don't know if it was anything personal, but [Burns] said there was a lot of money there, over [$13,000] easy.
>
> . . . .
>
> . . . [O]nly the son and sometimes the mother be there and they leave the

2

front door wide open.  They never lock it.

After picking up Collins, [Petitioner] drove to his "little stash spot" to retrieve his shotgun.  He unloaded the shotgun, but claims to have lost track of one of the shells.  He [said] that he "thought the shotgun was a six shell," but that he "only took five out of it." [Petitioner] admit[ted] that there might have been one round left in the shotgun chamber.  He placed the shells from the gun in the car's center console.

After making a stop, [Petitioner] drove Burns and Collins to 5th Avenue.  "The plan was to grab the guy up and make sure he couldn't call the police.  [Burns] said he knew where the money was and he would get it."  They parked in front of the Nolan property and got out of the car.  [Petitioner's] role was "to hold the shotgun and scare them."  Burns was "[t]o get the money" and Collins was "to keep anyone from getting to the phone."

On the front porch, Collins tried to open the front door, but it was locked.  He rang the bell and Mary Lou Nolan cracked the door open.  [Petitioner], holding the gun with both hands, stuck the barrel inside the door to prevent her from closing it.  A struggle ensued between Mary Lou Nolan and [Petitioner], with Nolan holding the barrel of [the] shotgun.  [Petitioner's] finger was on the trigger and a shot was fired.  Then the men ran to the car. [Petitioner] drove the car from the scene and parked it four or five blocks away; all three of them jumped out while the engine was still running.  Collins separated from [Petitioner] and Burns. [Petitioner], who was holding the gun as he got out of the car, went behind a bar and "stashed" the gun.  [Petitioner] and Burns then went to Tychic Phipps's house.

Phipps testified that after she received a phone call from Burns, she opened her door and saw the two men running alongside of the bar across the street from her house.  When they entered her house, Burns sat on the couch with his head in Phipps's hands and said to [Petitioner], "it wasn't supposed to go down like that." [Petitioner] responded, "I'm a little nigga.  You know that gun was too big for me to hold."  [Petitioner] demonstrated, as if holding an object pointing it toward the ground.  He also said "Chubbs froze up."  Both [Petitioner] and Burns were wearing black pants with "hoodies."  Burns removed his outer clothing.  [Petitioner] took off his hooded sweatshirt and asked Phipps for a jacket that "wasn't

black."  [Petitioner] told Burns that they needed "to go back around there" because "he left the car running" and "they gonna look at his license plate."  Burns left his clothing at Phipps's house.  Both [Petitioner] and Burns left gloves there.  Phipps took the articles that they left behind, put them in a bag, and tossed the bag outside.

Burns returned to Phipps's house in the early morning hours of February 10.  He asked Phipps what she had done with the "stuff" he had left the night before.  She told him that she had put it in a bag and thrown it over the porch.  Burns "got mad" and went outside to retrieve the bag.  Later that morning, he left with [Petitioner] who had arrived to pick him up.

After picking up Burns at Phipps's house, [Petitioner] told him they needed to move the gun.  They retrieved the gun from the "stash box," put it in the trunk of [Petitioner's] car, and drove to Newark where they "stashed" it.  [Petitioner] looked for the shells that he had previously put in the center console of his car, but they were not there.  Later that night, [Petitioner] returned to Newark to retrieve the gun; he then "threw it . . . by the railroad tracks."  When asked whether the shotgun was loaded when he dumped it by the railroad tracks, [Petitioner] explained, "[i]n Newark I unloaded the shotgun cause that's when I realized it was loaded with everything I had taken out.  That's when I found out it was only five shots."

On February 13, [Petitioner] was arrested at his home.  He was read his *Miranda*[ *v. Arizona*, 384 U.S. 436 (1966),] rights.  According to Sergeant Riley, [Petitioner] initially denied any involvement in the shooting.  After being told that his codefendants had been arrested and had given statements, [Petitioner] became "visibly upset and worried and started to cry."  [Petitioner] then gave his statement of the events that occurred on February 9.

(Document 8 attached to ECF No. 17 at 4-9).

Prior to trial, Petitioner filed a motion to suppress his statement to police, which resulted in a *Miranda* hearing held on January 17 and 23, 2003.   (Documents 4-6 attached to ECF No. 18). At that hearing, Sergeant Riley of the homicide unit of the Union County Prosecutor's Office testified regarding Plaintiff's arrest.   Riley testified that, on February 13, 2002, he responded to Petitioner's home.   (Document 4 attached to ECF No. 18 at 5).   Petitioner's mother and girlfriend

answered the door when Riley knocked, and Petitioner's mother told Riley that Petitioner was not home, but was out shopping or looking for a job.  (*Id.* at 5-6).   Riley testified that he then told Petitioner's mother that he had warrants for Petitioner's arrest and was looking to arrest and speak with Petitioner.  (*Id.* at 6).   Petitioner's girlfriend then called him, and Petitioner told Riley he would be home shortly.  (*Id.* at 6-7).   Petitioner returned home that afternoon.  (*Id.* at 7).   Riley thereafter identified himself, told Petitioner they needed to speak with him, and told Petitioner that "he's going to be under arrest and charged with participating in a murder."  (*Id.* at 7-8).   After Petitioner's mother encouraged him to tell the truth, Riley "advised [Petitioner] he was going to be placed under arrest [and] advised him of his *Miranda* rights verbally."  (*Id.* at 8).   Petitioner was then arrested and taken to the police station.  (*Id.* at 8-9).

Riley next testified that, after Petitioner arrived at the police station, Petitioner was again advised of his *Miranda* rights and was provided with a *Miranda* waiver form.  (*Id.* at 10).   The form was read to Petitioner, and Petitioner signed the form and initialed his recognition of each of his *Miranda* rights.  (*Id.* at 10-15).   Riley testified that, although Petitioner initially denied any involvement, after Petitioner was told that his co-defendants had already made statements, Petitioner began to cry and say that he was sorry, and ultimately gave the statement referenced above in which he confessed to inadvertently shooting the victim.[1]  (*Id.* at 16-19).   Petitioner ultimately gave and signed a written statement that evening.  (*Id.* at 21-24).   Riley also testified that Petitioner was never threatened or coerced, and the weapons of the officers who took the statement had been secured in lock boxes outside of the interview room throughout the questioning

---

[1] Petitioner also agreed to help the police find the shotgun he had hidden in Newark, and was taken to look for the gun prior to giving his formal, written statement, but the police were unable to locate the weapon.  (*Id.* at 19-21).

of Petitioner.   (*Id.* at 24-28).

Following Riley's testimony, two other detectives with the homicide unit, William Brennan and Bridget Lawrence, both testified regarding the interview of Petitioner after his arrest and transportation to the police station.   (*Id.* at 28-32, Document 5 attached to ECF No. 18 at 33-62).   Both Brennan and Lawrence confirmed Riley's version of events regarding the interview, including that Petitioner was informed he was under arrest before he was interviewed, that he was read and waived his *Miranda* rights, and ultimately gave his statement without being coerced or threatened.   (*Id.*).

Although Petitioner had originally planned on testifying at the hearing, Petitioner ultimately elected not to do so.   (Document 6 attached to ECF No. 18 at 2).   Because Petitioner would have been the only witness testifying in support of his motion to suppress, the following colloquy was conducted regarding Petitioner's decision not to testify.

> [Defense Counsel]:  . . . Judge, up to literally five minutes ago, [Petitioner] had indicated to me he would be testifying today.   That is the reason I geared my brief in the matter towards –
>
> THE COURT:   Well, that's what you told me last Friday.
>
> [Defense Counsel]:   Yes, coercion, intimidation, force used upon him to give a statement.   [Petitioner] has changed his mind for whatever the reasons and informed me minutes ago that he now does not want to testify in the case.   So I would ask your Honor to address him to make sure of that, and obviously on the motion itself I would simply rely on my brief.
>
> THE COURT:   All right.   [Petitioner], first of all it's your decision whether you wish to be a witness during any court proceedings or not.   It's your personal decision to make after consulting with your attorney.   Did you have enough time to talk to your lawyer about that?
>
> [Petitioner]:   I just spoke to him just now about it.   That's the way

6

I feel about it.

THE COURT:   Okay.   But you understand it's your decision.

[Petitioner]:   It's my decision, correct.

THE COURT:   If you do decide you want to testify [the] State has a right of cross-examination, and obviously any statements you make during the course of these proceedings can be used in any subsequent trial proceedings.   I'm not saying that to intimidate you. I'm just letting you know what your rights are.   And you also have a right to take the stand [to] tell your side as to what occurred. Understand all that?

[Petitioner]:   Yes.

THE COURT:   In light of what I just explained to you and the conversation with your attorney, it's your desire not to be a witness [at this *Miranda* hearing]?

[Petitioner]:   Yes.

THE COURT:   Okay.   Any other witnesses beside [Petitioner]?

[Defense Counsel]:   No, Judge.

(Document 6 attached to ECF No. 18 at 2-3).   Based on the testimony of the officers, and after considering the briefs filed in support of and opposition to the motion to suppress, the trial court denied the motion to suppress as Petitioner had been provided with his *Miranda* rights and had intelligently, knowingly and voluntarily waived them.   (*Id.* at 4-9).

Petitioner was thereafter tried by jury on June 10 through 13, 2003.   At trial, the first witness to testify was the victim's husband, Michael Nolan.   (Document 7 attached to ECF No. 18 at 23).   Mr. Nolan testified regarding the set up and shape of his home and then provided a summary of his having spent the day of the shooting with his wife, two sons, and grandchildren. (*Id.* at 28-32).   Mr. Nolan then testified to the events on the night in question, including being

7

awakened by the sound of glass and finding his wife who had been shot as recounted in the Appellate Division's opinion quoted above.  (*Id.* at 33-36).  Mr. Nolan also provided the basis for the admission into evidence of several photographs showing the results of the shooting, including the broken glass of the door, his deceased wife's blood upon the stairs and floor, and the damage to his fireplace inflicted by the shotgun fired by Petitioner.  (*Id.* at 37-44).  On cross-examination, Mr. Nolan also recounted that his son had a history of criminal charges relating to the sale of marijuana.  (Document 8 attached to ECF No. 18 at 47).

Following Mr. Nolan, the state called Officer Stephen Ortiz of the Union County Sheriff's Office.  (*Id.* at 51).  Officer Ortiz provided a further basis for the admission of various photographs of the scene of the shooting, and in the process of doing so recounted much of the physical evidence which was recovered from the scene of the shooting including the victim's blood, shotgun projectiles which were embedded in the fireplace and furnishings of the Nolan home, and broken glass.  (*Id.* at 51-87).  Ortiz also testified that he assisted in processing the scene and collecting various evidence including the projectiles and blood samples.  (*Id.* at 86-88).  Finally, Ortiz testified that the projectiles that were recovered were pellets from a fired shotgun shell.  (*Id.* at 88-89).

The State then called Detective Mark Sojak of the Morris County Prosecutor's Office.  (Document 10 attached to ECF No. 18 at 4).  Detective Sojak, who had been a patrolman in the Roselle Police Department, testified that he reported to the scene of the shooting following Mr. Nolan's 9-1-1 call and found Mrs. Nolan bleeding heavily from a gunshot wound to her right shoulder.  (*Id.* at 5-7).  The Detective further stated that it "looked like [she] was shot at close range because there [were] burn marks and powder residue around" the wound.  (*Id.* at 8).  The

Detective also testified as to Mrs. Nolan being airlifted to the hospital where she died shortly after arrival.   (*Id.* at 8-13).

The next witness to testify was the medical examiner, Dr. Junaid Shaikh.   (*Id.* at 15).   Dr. Shaikh testified that Mrs. Nolan had died from a close range shotgun wound to the upper right area of the chest.   (*Id.* at 23-26).   Based on his observations of Mrs. Nolan's wounds, Dr. Shaikh ultimately concluded that she had been shot of a distance of approximately one foot or less.   (*Id.* at 28).

The State next called Tychic Phipps.   (Document 11 attached to ECF No. 18 at 63).   Ms. Phipps testified to the events which occurred in her home recounted in the Appellate Division's opinion, including the statements Petitioner and his co-defendant made regarding the shooting of Mrs. Nolan.   (*Id.* at 63-73).   Petitioner did not object to Ms. Phipps testimony as to the statements of himself and his co-defendant.[2]   (*Id.*).

The State's final witness at trial was Detective Carl Riley.   (*Id.* at 96).   Detective Riley testified at length as to Petitioner's arrest, questioning, and his statement to the police as discussed above both in the Appellate Division's opinion and in Riley's testimony at the *Miranda* hearing. (*Id.* at 96-100; Document 9 attached to ECF No. 18 at 101-149).   During this testimony, Detective Riley again reiterated that, prior to questioning Petitioner, he and the other officers secured their weapons in a locker outside of the interrogation room, and that Petitioner was well treated and neither threatened nor coerced during questioning.   (Document 9 attached to ECF No. 18 at 101-149).   During the questioning of Riley, the following exchange took place after the prosecutor

---

[2]  Counsel did object, however, to the State's question of what Petitioner meant when he talked about going "back around there."   (*Id.* at 71).

asked Riley how Petitioner initially behaved during the interview:

> [Riley:]   Initially he denied having any involvement, you know, in the incident.   Then also he indicated that he knew Shane Burns and he was out with him earlier that day, but he did not see him during the time of the incident.
>
> [The State:]   After hearing that version of events, did you say anything to [Petitioner] concerning your knowledge of the case?
>
> [Riley:]   At that time he was confronted and we advised him that Shane and Sha[k]ore Collins had been arrested and charged in this matter and they did give statements telling the truth –
>
> THE COURT:   Wait a minute.   Don't start telling us what anybody said.   Okay?   Can I see counsel over here.
>
> [The Court then initiated a sidebar.]
>
> THE COURT:   The whole purpose of doing separate trials is the jury doesn't know that there are statements from co-defendants.
>
> [The State:]   Well, he didn't say anything about implicating him.
>
> THE COURT:   Well, he's getting very close to starting by saying they told us the truth.
>
> [The State:]   I'll assure right now that he does not do that.
>
> [The side bar concluded and questioning resumed.]
>
> [The State:]   Detective, without telling us anything that was said, did you advise [Petitioner] that Shane Burns and Sha[k]ore Collins had been arrested?
>
> [Riley:]   Yes.
>
> [The State:]   And did you have a conversation afterwards with [Petitioner]?
>
> [Riley:]   Yes.
>
> [The State:]   And based on that conversation did . . . anything happen with [Petitioner]?   Did his demeanor change at all?

> [Riley]:  Yes.  [Riley thereafter testified regarding the statement Petitioner gave admitting his involvement in the shooting of Mrs. Nolan.]

(*Id.* at 109-11).

On cross examination, counsel for Petitioner asked Detective Riley whether he would "deny" that he had brought a gun into the interview room, whether he would "deny" that he had placed that gun on the table during the interview of Petitioner, and whether he would "deny" placing a photograph of the victim on the table during the interview.  (Document 12 attached to ECF No. 18 at 151-56, 163-64).  The detective denied all three events, stating that his weapon had been placed in a locker before the interview, and that no photo of the victim was used.  (*Id.*).

Following the detective's testimony, the state rested its case after moving several items into evidence.  During that process, the Court returned to the issue of Riley's statement regarding Petitioner's co-defendants speaking with the police and their "telling the truth."

> [THE COURT:]  When we went to side bar an issue had come up concerning Detective Riley talking about statements.  Two co-defendants were under arrest and he started to talk about the statement, and he said as a result of the question of the prosecutor they gave a truthful statement and I told him to stop basically in mid-sentence at that point because I was afraid [of] what was [going to] come out of his mouth next.  And, you know, what did they tell you or whatever he was [going to] say.  I don't know where he was going with it.
>
> Now we discussed this in chambers and I did not give a limiting instruction and I'll say why I didn't for the record.  I didn't because you don't know what the statements are.  You don't know if they inculpated, exculpated.  This jury heard nothing.  And quite honestly if I started to put some emphasis upon it I was more concerned that I would alert the jury as to a potential problem.  And I never said to them to disregard.  I just left it alone, and I did that on purpose.

11

If you want me to address that issue, [defense counsel], with the jury I will.   I mean I . . . treated it as I thought it should have been treated at the time.   You didn't ask me to do anything.

[Defense Counsel]:   No, Judge.   I think that it was handled properly by the court.

(*Id.* at 197-98).

As Petitioner had no witnesses to call other than himself, the Court then conducted the

following colloquy:

[THE COURT:]   Other than [Petitioner], do you have any witnesses that you're going to call?

[Defense Counsel:]   Other than [Petitioner] no, Judge, I do not.

THE COURT:   Okay.   Then I'll address [Petitioner] at this point. [Petitioner], you have a choice whether you wish to be a witness or not in this case.   This is your decision, not your attorney's decision. This is one time you're [going to] pretty much overrule your lawyer. You can be a witness or not be a witness.   You sat through the entire trial.   You understand that if you testify your lawyer will ask you questions.   [The p]rosecutor has a right of cross-examination of you.   Do you need to speak to [Petitioner] about his decision or has it been made?

[Defense Counsel:]   I do, Judge –

THE COURT:   No problem.   I'll give you some time to talk to your lawyer as to whether you wish to be a witness or not in this case.   Should you decide [that] you do not wish to be a witness in this case, then you have a second decision to make, that is whether you want me to tell the jury what's on this paper.   Basically[,] they cannot consider for any purpose or in any manner in arriving at their verdict the fact [that] you did not testify as a witness.   That should not enter into their discussions or deliberations in any way, shape or [form].   You're entitled to [the] presumption of innocence even if you don't testify as a witness.   I think I'm pretty close.   I will either tell the jury what's on that form or say nothing to them.   You only need make that decision if you do not testify.

I'll give you some time.   You talk to your lawyer, then we'll

12

deal with that issue, then I'll come out and we'll deal with the jury.

[The judge then discussed scheduling issues with the attorneys and permitted Petitioner time to discuss the matter with counsel.]

THE COURT:   All right.   [Petitioner], have you made a decision whether you wish to be a witness in this trial or not?

[Petitioner:]   No, [I] don't want to be a witness.

THE COURT:   You do not.   You had enough time to talk to your lawyer about that?

[Petitioner:]   Correct, correct.

THE COURT:   She answered all your questions about the issue?

[Petitioner:]   Yes she did.

THE COURT:   Okay.   I see I have on my desk the form indicating that you wish me to tell the jury what is on this form that I said before on the record, is that correct?   And you had enough time to speak to your lawyer about that?

[Petitioner:]   Yes, and [I] do it voluntarily[,] yes.

THE COURT:   Okay.

(*Id.* at 199-200, Document 13 attached to ECF No. 18 at 201-02).

The case then proceeded to the parties' summations.   During her summation, defense counsel questioned Detective Riley's story regarding the taking of Petitioner's statement. (Document 14 attached to ECF No. 18 at 25).   Specifically, counsel rejected Riley's denials during cross examination stating that she "didn't buy it" and that Petitioner would not have so drastically changed his story without some kind of coercion asserted against Petitioner, be it trickery, lying about whether Petitioner was under arrest, lying regarding Petitioner's rights, or using his weapon or photos of the victim to push Petitioner to confess.   (*Id.* at 25-30).   Counsel

thus suggested that Petitioner's statement was full of details added by Riley and therefore did not accurately describe what had happened, and should therefore not be sufficient to establish Petitioner's guilt.  (*Id.* at 30-33).  The State responded to this argument in its summation as follows:

> Sergeant Riley.  [Petitioner's counsel] says.  She suggests to you Detective Riley was not straight up in how he testified or presented this to [Petitioner].  The biggest point she makes with him is that the reason I guess that you should know that this case or this interrogation somehow went differently than how he says was because he denies everything she says.

> What are we talking about?  Do you recall there was a question asked by [defense counsel]:  So Detective Riley, if I told you that you put your gun on the table while you were doing this interrogation you would deny that.  Right?  Ma'am, my gun wasn't in the room.  So you would deny it.  Right?  Yeah.  If I told you that you put a picture, a picture of Mary Lou Nolan on the table in front of [Petitioner] you would deny that.  Right?  Yeah.

> Not for nothing ladies and gentlemen, where in the evidence in this case did you hear anything about any of those kind of things happening?  You have a job and it has to be based on the evidence.  Where did any of that come from?  She asks a question like that and because he says no it doesn't happen, all of a sudden it must have happened that way and he's a liar?

> Detective Riley, isn't it true you were born in 1930[?]  No.  So you deny that.  Yeah.  Does that mean he must have been born in 1930?  I mean it doesn't make any sense.  Why not just have said Detective Riley do you deny taking your gun and sticking it in his mouth as he signed every one of these 24 pages in his statement.

> [Defense counsel:]  Judge, I apologize.  I have to [object].

> THE COURT:  Sustained.  Improper comment.  That was not said and you're exaggerating it.  Let's go.  Jury's to disregard that last analogy and comment.  Can I see counsel at side bar.

> [Side bar commenced.]

14

> THE COURT:   It is proper comment [for the Prosecutor to] respond to what happened.   Counsel said two things I want to bring up to make sure you're not [going to] say.   You never brought up a [*State v. Clawans*, 38 N.J. 162, 183 A.2d 77 (1962),] issue that you want to comment on the failure to produce a witness.   You can't do it because it was not disclosed prior to summation.   That's number 1.
>
>     Number 2.   Stop characterizing.   Get yourself under control.   In plain simple English.
>
> [The State:]   Yes, your Honor.

(*Id.* at 40-42).   The final statement made during summation that Petitioner challenges occurred while the State was summarizing the facts of the case in terms of the recklessness required for the manslaughter charge Petitioner faced.   (Document 15 attached to ECF No. 18 at 69-70). Specifically, the prosecutor characterized Petitioner's actions as taking "this gun, this shotgun that could have had one [round] in it and stuck it in her face in the door when she got there."   (*Id.* at 70).

On June 13, 2003, the jury returned a verdict in this matter.   Specifically, the jury found defendant guilty of first degree reckless manslaughter in violation of N.J. Stat. Ann. § 2C:11-4(b) (a lesser included offense of aggravated manslaughter), second degree robbery in violation of § 2C:15-1, first degree felony murder in violation of § 2C:11-3(a)(3), second degree possession of a weapon for an unlawful purpose in violation of § 2C:39-4(a), and third degree unlawful possession of a weapon without a permit in violation of §§ 2C:58-3 and 2C:39-5(c)(1).   (*See* Document 22 attached to ECF No. 17 at 2).   On July 25, 2003, Petitioner filed a motion for a new trial in which he argued that the verdict was against the weight of the evidence and that a new trial was required because New Jersey law does not allow for a conviction based solely on the basis of a defendant's uncorroborated statement.   (Document 19 attached to ECF No. 18 at 1-12).   The trial court denied

that motion.   (*Id.* at 18-41).   Petitioner was thereafter sentenced by the trial court, which merged the charges for robbery, manslaughter, and possession for an unlawful purpose into felony murder, and sentenced Petitioner to a thirty-five year prison term with a thirty-year period of parole ineligibility.   (Document 22 attached to ECF No. 17 at 2).   The trial court also sentenced Petitioner to a consecutive five years' imprisonment on the possession without a permit charge. (*Id.*).

Petitioner appealed the verdict and sentence, and the New Jersey Appellate Division affirmed as to all claims except the claim that he was improperly sentenced as to the possession without a permit charge.   (*Id.*).   As to that charge only, the Appellate Division remanded for resentencing under *State v. Natale*, 184 N.J. 458, 878 A.2d 724 (2005) (eliminating presumptive sentencing terms in light of *Blakely v. Washington*, 542 U.S. 296 (2004)).   (Document 22 attached to ECF No. 17 at 2).   The matter was remanded to the sentencing court, which resentenced Petitioner to the same five years' imprisonment under New Jersey's post-*Natale* sentencing scheme.   (*Id.*).   The New Jersey Supreme Court thereafter denied Petitioner's petition for certification on direct appeal.   (*Id.*).

On or about June 2, 2008, Petitioner filed a petition for post-conviction relief in the trial court.   (ECF No. 17 at 3).   In his PCR petition, Petitioner raised for the first time claims that the trial court had improperly failed to charge the jury as to renunciation and causation.   (Document 22 attached to ECF No. 17 at 3).   The PCR court rejected that claim procedurally because it could have been, but was not, raised on direct appeal, and was therefore procedurally defaulted.   (*Id.* at 3-4).   The PCR court also rejected that claim on the merits under New Jersey law.   (*Id.* at 4). Petitioner also raised on PCR a claim that counsel was ineffective for failing to call his mother,

16

girlfriend, and himself to testify at the *Miranda* hearing to testify that Petitioner had not been told by the police that he was under arrest based on affidavits those purported witnesses signed in June 2009.   (*Id.* at 4-5).   The PCR court rejected that claim both because the affidavits would have been of limited value based on the relationship of the potential witnesses to Petitioner, and, more importantly, because those affidavits were directly contradicted by significant evidence in the record, including the testimony of the officers at the *Miranda* hearing and Petitioner's own acknowledgement on the *Miranda* form that he was under arrest which was signed before he gave his inculpatory statement.   (*Id.* at 4-6).   The PCR court also found no prejudice from the failure to call these witnesses, as their testimony would have been looked upon with skepticism in light of their relationship to Petitioner and the evidence in the record contradicted their purported testimony.   (*Id.*).   The PCR court did not hold a full evidentiary hearing on that matter.   (*Id.* at 6-7).

Petitioner appealed, and the Appellate Division affirmed in an opinion dated March 22, 2012.   The New Jersey Supreme Court denied Petitioner's petition for certification on October 10, 2012.   (Document 17 at 3).   Petitioner thereafter filed his initial habeas petition on or about December 26, 2012.   (ECF No. 1).

## II.  DISCUSSION

## A.  Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012).   Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts.  *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court.  *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to

afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### B. Analysis

### 1. Petitioner's claims that the trial court erred by failing to charge the jury as to renunciation and causation are procedurally barred.

In his petition, Petitioner presents three claims which assert that the trial court erred in failing to charge the jury in his criminal trial as to renunciation and causation. When he presented these claims to the New Jersey courts on post-conviction review, however, both the trial court and Appellate Division held that these claims were procedurally barred as they had been previously litigated in Petitioner's motion for a new trial, and because they could have been, but were not, raised on direct appeal, both of which resulted in these claims being procedurally barred by two state court procedural rules. (*See* Document 22 attached to ECF No. 17 at 3-4). "Where a state court refuses to consider a petitioner's claims because of a violation of state procedural rules, a federal habeas court is barred by the procedural default doctrine from considering the claims . . . unless the habeas petitioner can show cause for the default and prejudice attributable thereto." *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004) (internal citations and quotations omitted), *cert denied sub nom.*, *Johnson v. Ortiz*, 546 U.S. 849 (2005). To show cause, a petitioner must show that "'some objective factor external to the defense impeded counsel's efforts' to raise the

19

claim." *Parkin v. United States*, 565 F. App'x 149, 151-52 (3d Cir. 2014) (quoting *United States v. Pelullo*, 399 F.3d 197, 223 (3d Cir. 2005)); *see also Johnson*, 392 F.3d at 563.  "Cause, therefore, can be established by showing, for example, that the factual or legal basis for a claim was not reasonably available to counsel or that government interference made compliance with the procedural rule impracticable.   Attorney error may constitute cause only where such error rises to the level of ineffective assistance of counsel in violation of the Sixth Amendment."  *Johnson*, 392 F.3d at 563.   Even where a petitioner can show cause, he is still required to demonstrate that he suffered actual prejudice as a result which requires a showing that the alleged errors "worked to his actual and substantial disadvantage infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982).

Here, Petitioner has not shown cause for his procedural default.   Indeed, the only argument Petitioner makes as to procedural default is that his petitions both here and in the PCR court were timely filed, and as such should not be barred.   The statute of limitations, however, is not the procedural bar on which the PCR court and Appellate Division rested.   As such, that argument provides no support for Petitioner's argument that this Court should hear those claims.   To the extent that Petitioner attempts to rest on ineffective assistance of appellate counsel, that argument fails to demonstrate cause for the reasons discussed below regarding Petitioner's ineffective assistance arguments.   In any event, Petitioner has also failed to demonstrate what prejudice, if any, resulted from the trial court's refusal to provide the renunciation and causation charges he now requests.   Indeed, in light of the PCR court's alternative holding that New Jersey state law would not permit those charges under these circumstances, (*see* Document 22 attached to ECF No. 17 at 4-5), it is doubtful Petitioner could show any prejudice as a result.   Because Petitioner has

failed to show cause or actual prejudice, those claims remain procedurally barred and present no basis for habeas relief.

**2.   Petitioner's claims that the testimony of Ms. Phipps and Detective Riley violated his rights under the Confrontation Clause of the Sixth Amendment**

Petitioner asserts that the testimony of Ms. Phipps and Detective Riley as to statements made by his co-defendants violated his confrontation clause rights.   Petitioner also asserts that these statements were inadmissible hearsay.   The Confrontation Clause of the Sixth Amendment protects a criminal defendant "*only* against the introduction of testimonial hearsay statements, and [the] admissibility of nontestimonial hearsay is governed solely by the rules of evidence."   *United States v. Berrios*, 676 F.3d 118, 126 (3d Cir. 2012); *see also Michigan v. Bryant*, 562 U.S. 344, 352-54 (2011); *Whorton v. Bockting*, 549 U.S. 406, 419-20 (2007); *Davis v. Washington*, 547 U.S. 813, 823-24 (2006).   "[W]here nontestimonial hearsay is concerned, the Confrontation Clause has no role to play in determining the admissibility of a declarant's statement."   *Berrios*, 676 F.3d at 126.   The Confrontation Clause inquiry is therefore a two-step process: courts must first determine whether a given out of court statement is testimonial in nature, and then apply the appropriate safeguard.   *Id.* at 127.   Thus, if a statement is non-testimonial, the inquiry is limited solely to whether the statement was properly admitted under the appropriate rules of evidence. *Id.*   Where a statement is testimonial in nature, however, it may only be admitted where the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.   *Id.* (citing *Crawford*, 541 U.S. at 68).

Thus, the first question this Court must answer is whether the statements at question were

testimonial in nature.  The Court in *Crawford* chose not to endorse any specific definition of "testimonial," instead noting that the statements made to police in the course of an interrogation in that case were testimonial regardless of how narrow the standard was.  *See United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005).  The *Crawford* Court did consider three potential definitions, however:  "*ex-parte* in-court testimony or its functional equivalent," "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements [such as] those 'made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial."  *Id.* at 179-80 (quoting *Crawford*, 541 U.S. at 51-52).  Based on the caselaw, it is clear that statements made in the course of an interrogation are virtually always testimonial, while surreptitiously monitored conversations generally are not.  *Berrios*, 676 F.3d at 127-28.

Turning first to the testimony of Ms. Phipps, it is clear that the out of court statements of Petitioner's co-defendant to which Ms. Phipps testified were clearly non-testimonial statements. The statements Ms. Phipps provided were statements by Petitioner and his co-defendant made without prompt or interrogation discussing the events which had occurred during the criminal act the escape from which they were in the process of completing.  Even under the broadest definition considered in *Crawford*, that any statement which would lead an objective witness to reasonably believe the statement would be available for use at trial, the statement is not testimonial.  An objective person in the place of Petitioner or his co-defendant would not reasonably believe that these statements, made in the heat of the moment after fleeing from the scene of a botched robbery resulting in the shooting of the victim, would be available for use at trial.  Indeed, the Court in *Crawford* specifically noted that the statements in furtherance of a conspiracy exception, under

22

which these statements were admitted by the state courts, are generally "by their nature . . . not testimonial." *Crawford*, 541 U.S. at 56.   These statements are clearly more similar to the surreptitiously recorded conversations found to be non-testimonial in cases like *Berrios* than the answers to interrogations found to be testimonial in *Crawford*.   As such, this Court concludes that these statements were non-testimonial in nature, and thus do not merit the protections of the Confrontation Clause.   *Berrios*, 676 F.3d at 127-28.

Because the statements contained in Ms. Phipps' testimony were not testimonial in nature, their admissibility is controlled entirely by the applicable state law rules of evidence.   *Id.*   The admissibility of evidence is a state law issue and challenges based on purely state law issues are generally not cognizable on habeas review unless the error is so egregious that it raises a concern of a constitutional magnitude.   *See Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009); *Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001).   On direct appeal, the Appellate Division in this matter concluded that the statements at issue were admissible under New Jersey's evidentiary rules, specifically under the co-conspirator exception.   Petitioner has provided no basis under which this Court could conclude that the admission of this hearsay evidence, which was admissible under state law, amounted to a violation of Due Process.   As such, Petitioner's claim regarding this evidence does not present a cognizable claim for habeas relief.

Turning to the testimony of Detective Riley, Petitioner's claim challenges Riley's testimony that he told Petitioner that he had spoken with his co-defendants and that they had told the truth.   The trial court reacted immediately before Petitioner even had an opportunity to object and prevented the detective from making any statement whatsoever as to what the co-defendants

said.   Indeed, Riley made no mention of what the co-defendants said, and, contrary to Petitioner's argument, in no way stated that the co-defendants admitted their involvement or gave otherwise inculpatory statements.   Riley, essentially, did not testify to any specific out of court statement, and thus did not provide hearsay testimony other than that concerning Petitioner's own statement. Because the testimony Petitioner challenges was not hearsay, it does not run afoul of the Confrontation Clause, and Petitioner's argument regarding that testimony provides no basis for habeas relief.[3]

### 3.   Petitioner's argument that the trial court erred in denying the motion for a new trial based on a lack of evidence corroborating his statement

Petitioner next argues that the trial court erred in denying Petitioner's motion for a new trial based on the argument that his conviction was based only on his "uncorroborated" statement. Pursuant to Supreme Court case law, a court reviewing a claim based on the sufficiency of the evidence in a habeas petition must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *Eley v. Erickson*, 712 F.3d 837, 847 (3d Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).   A court may therefore overturn a

---

[3]  In any event, to the extent that any error may have occurred, Petitioner's claim would amount to invited error and would not provide a basis for relief in any event.   *See, e.g., United States v. Maury*, 695 F.3d 227, 256-57 (3d Cir. 2012).   Here, the trial court provided Petitioner the opportunity to request a limiting instruction or other remedy to Detective Riley's testimony, and Petitioner's counsel declined, stating that the judge had taken the correct action in regard to the questioned testimony.   As Petitioner, through counsel, consented to and approved of the course of action taken, and rejected an explicit opportunity to request corrective measures, he cannot cry foul as to the action in question.   *Id.*

conviction on that basis only "if it is found that upon the record evidence adduced at trial [that] no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324).   Petitioner's argument here essentially rests on a venerable rule of New Jersey criminal law that "an uncorroborated extrajudicial confession cannot provide the evidential basis to sustain a conviction."   *State v. Lucas*, 30 N.J. 37, 51, 152 A.2d 50 (1959); *see also Smith v. United States*, 348 U.S. 147, 152 (1954) ("an accused may not be convicted on his own uncorroborated confession").   Case law suggests, however, that this rule is not constitutionally based, and therefore a "violation" of the uncorroborated confession rule may not amount to a violation cognizable on habeas review.   *See, e.g., Bennett v. Ricci*, No. 06-3583, 2007 WL 2444118, at *17 (D.N.J. Aug. 22, 2007).

Regardless of whether the rule is of a constitutional dimension, it is clear here that Petitioner was not convicted solely on the basis of his own uncorroborated statement.   The State produced more than sufficient evidence to corroborate Petitioner's statement.   The physical evidence in this case showed that the door to the Nolan home had been broken, and that Mrs. Nolan was shot from close range with a shotgun, all of which is copacetic with Petitioner's assertion in his statement that he forced his way into the Nolan home, that Mrs. Nolan grabbed the shotgun, and that the shotgun went off, striking Mrs. Nolan at exceedingly close range.   The testimony of Ms. Phipps likewise corroborated Petitioner's statements regarding the flight from the scene of the crime and disposing of the evidence, and the statements to which Ms. Phipps testified, such as Petitioner's being too small to control the shotgun, further supported the version of events contained in Petitioner's statement.   The evidence in the record clearly shows that Petitioner's claim is patently without merit: his confession here was clearly corroborated by both Ms. Phipps'

testimony and the physical evidence produced at trial, and the evidence in total, including the corroborated confession, clearly established sufficient evidence that a rational trier of fact could find Petitioner guilty of robbery, manslaughter, felony murder, and the weapons charges involved in Petitioner's conviction.   Thus, there was sufficient evidence in the record to support Petitioner's conviction, and Petitioner's sufficiency of the evidence claim provides no basis for habeas relief.

### 4.  Petitioner's sentencing claims

In two of his points, Petitioner claims that his sentence is excessive under State sentencing law, and that his sentence violates *Blakely* in so much as he was initially sentenced beyond the presumptive sentencing term.   "Sentencing is generally considered a matter of state criminal procedure, which does not fall within the purview of federal habeas review."   *Vreeland v. Warren*, No. 11-5239, 2013 WL 1867043, at *17 (D.N.J. May 2, 2013).   Federal courts are thus limited on habeas review of a petitioner's sentence to the question of whether the prisoner's sentence exceeds the relevant statutory limits.   *Id.*   To the extent that Petitioner argues that his sentence was excessive, this Court notes that he was sentenced at or below the statutory maximum for the crimes of which he was convicted, *see generally* N.J. Stat. Ann. § 2C:43-6, and his claims are therefore based on his disagreement with the state courts' determinations regarding the reasonableness of his sentence, and thus states only a state law claim which is not cognizable on habeas review.   *Id.* To the extent that Petitioner argues that his sentence violates *Blakely* in so much as he was sentenced to more than the presumptive term under New Jersey's pre-*Natale* sentencing regime, that argument, too, is precluded here because any error, if error there was, was corrected by the trial court's resentencing of Petitioner under the post-*Natale* New Jersey sentencing regime.   *See*

26

*Gully v. Hoffman*, No. 12-1074, 2015 WL 6502093, at *7 (D.N.J. Oct. 27, 2015).   As Petitioner

was sentenced at his resentencing to a term that was at or below the maximum sentence authorized

by his conviction alone under the post-*Natale* regime, his resentencing to a five year term on his

possession of a weapon without a permit conviction does not violate *Blakely*.   *Id.*; *see also* N.J.

Stat. Ann. § 2C:43-6(a)(3) (maximum sentence authorized under post-*Natale* New Jersey law by

a conviction for a third degree offense without any further fact finding is five years).


### 5.   Petitioner's prosecutorial misconduct claims

Petitioner next asserts that several comments made by the prosecutor during summation

denied him his right to a fair trial.   "The Supreme Court has held that prosecutorial misconduct is

insufficient to overturn a conviction unless it 'so infect[s] the trial with unfairness as to make the

resulting conviction a denial of due process.'"   *Reid v. Beard*, 420 F. App'x 156, 159 (3d Cir.

2011) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).   That a prosecutor's

comments were inappropriate or even "deserving universal condemnation" is insufficient to

warrant habeas relief.   *Id.*; *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986).   A district

court reviewing such a claim in a habeas petition must instead "'examine the prosecutor's

offensive actions in context and in light of the entire trial, assessing the severity of the conduct,

the effect of the curative instructions, and the quantum of evidence against the [petitioner]' to

determine if [the] prosecutorial conduct rises to a level that infects the trial with such unfairness

as to make the resulting conviction a denial of due process."   *Reid*, 420 F. App'x at 159 (quoting

*Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Petitioner presents two instances during the prosecutor's summation wherein he alleges

misconduct took place.   First, Petitioner asserts that the prosecutor misconstrued the evidence in characterizing Petitioner's actions as putting his shotgun "in [Mrs. Nolan's] face."   As to this claim, Petitioner is incorrect in asserting that this statement amounts to misconduct.   Based on the fact that the evidence at trial, including Petitioner's statement, establishes that Petitioner thrust the gun into the door towards Mrs. Nolan, and ultimately the gun was fired at Mrs. Nolan from less than a foot away, it would be accurate to say the weapon was in her face based on the colloquial meaning of the phrase which is clearly what the prosecutor was intimating at trial.   Even if one took the more literalist bent to which Petitioner clings, this characterization is not wholly inaccurate as the shotgun was at the very least pointed at Mrs. Nolan's upper chest and was therefore likely within a foot or two of her face prior to the gun being fired.   The prosecutor's statement was therefore at worst a harmless slight mischaracterization, and thus cannot be said to have in any way made the trial unfair.

Petitioner's second assertion has slightly more weight.   As his second argument, Petitioner asserts that the prosecutor committed misconduct when he responded to defense counsel's summation by asserting that defense counsel was essentially arguing that Detective Riley's denials should lead the jury to believe Detective Riley was lying.   While it was entirely fair comment for the prosecutor to respond to this argument as he did initially, the prosecutor certainly made an inappropriate argument when he suggested that counsel was essentially asserting that Detective Riley put his gun in Petitioner's face while he made his statement.   While it is fairly clear that this comment was inappropriate, both the trial court and defense counsel responded to this comment immediately, with counsel objecting, the trial court sustaining that objection, and the court ordering that the jury disregard that statement.   Indeed, the trial court even directly chastised the

prosecutor as to that comment and made it clear no further such inappropriate comments would be tolerated.   The prosecutor thereafter ceased engaging in any such behavior and the remainder of his summation was confined to appropriate fair comments.

Even if one assumes that this comment by the prosecutor would merit universal condemnation, it is clear that defense counsel's immediate objection, the trial court's sustaining of the objection, and the court's clear rebuke of the prosecutor, coupled with the instruction that the jury was to disregard the comment, were more than sufficient to correct any prejudice the statement may have caused Petitioner.   In light of the strong evidence against Petitioner, the brief nature of the comment, and the immediate corrective response, this Court cannot conclude that the prosecutor's comment so infected the trial as to render Petitioner's trial unfair.   As such, the prosecutor's comment, subject to a curative response from the trial court as it was, does not amount to a violation of Petitioner's due process rights, and thus is insufficient to warrant habeas relief. *Reid*, 420 F. App'x at 159-60.

### 6.   Petitioner's claim that the trial court erred by failing to charge the jury as to attempt

Petitioner next argues that the trial court erred by failing to charge the jury as to criminal attempt.   "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."   *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001).   An allegedly improper jury instruction only warrants habeas relief where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."   *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).   That a given instruction is "undesirable, erroneous, or even universally condemned"

29

is, in and of itself, insufficient to warrant habeas relief.   *Id.* (quoting *Henderson*, 431 U.S. at 154). The burden of demonstrating that a given instruction will warrant habeas relief is greater than that required to demonstrate plain error on direct appeal.   *Id.*   In reviewing a given instruction, courts cannot view the instruction in a vacuum, but instead must view the instruction in the context of the overall charge.   *Id.*

Petitioner argues that the trial court erred in failing to charge the jury as to the "standard of culpability for attempt" in regard to the trial court's charges as to robbery and felony murder. Under New Jersey Law, a person is guilty of robbery if "in the course of committing a theft" he either inflicts bodily injury or uses force upon another, threatens another with or purposely places another in immediate fear of bodily injury, or commits or threatens to commit any crime of the first or second degree.   N.J. Stat. Ann. § 2C:15-1(a).   The phrase "in the course of committing a theft" is statutorily defined to include events occurring "in an attempt to commit theft or in immediate flight after the attempt or commission [of a theft]."   *Id.*   Likewise, a criminal homicide amounts to felony murder where the actor, either alone or with others, causes the death of the victim in the course of committing, during an attempt to commit, or during flight after the commission or attempted commission of any one of several enumerated crimes including robbery. N.J. Stat. Ann. § 2C:11-3(a)(3).   Under New Jersey Criminal law, an attempt occurs when a person, acting with the kind of culpability required for the charged crime, purposefully engages in conduct which would constitute the crime if the circumstances were as a reasonable person would believe them to be, does or omits to do anything with the purpose of causing a particular result when causing that result is an element of the crime, or purposely does or omits to do anything which is an act or omission constituting a substantial step in the course of conduct planned to

culminate in his commission of the crime.   N.J. Stat. Ann. § 2C:5-1(a)(1)-(3).

During the jury charge as to robbery and felony murder, the trial court explained to the jury the elements of each crime.   In so doing, the trial court specifically noted that the "in the course of committing a theft" language included the use or threat of force during an attempt to commit a theft or during the flight from a theft or attempted theft.   (Document 16 attached to ECF No. 18 at 105-06).   In so explaining, the trial court further explained to the jury as follows: "[s]o even if you believe he was trying to walk away from [the attempted theft], he was still in the course of committing a theft because he was there and he did a substantial step in committing the theft, [in so much as he] got the gun [and] went to the building and that's what an attempt is, a substantial act which leads [towards] the commission of the event itself."   (*Id.*).   The trial judge further informed the jury that they could not find Petitioner guilty of felony murder unless they found him guilty of the underlying robbery charge.   (*Id.* at 110-15).   It is clear, then, that the trial court provided at least one of the three definitions of criminal attempt in charging the jury, albeit as part of the robbery charge.   It is also clear that of the three possible definitions of attempt, the one charged was the most appropriate under the circumstances.   *See* N.J. Stat. Ann. § 2C:5-1(a)(1)-(3).   To the extent that Petitioner is arguing that the trial court did not define the purposeful element of attempt, this assertion fails because, in relation to the robbery, the trial court specifically explained to the jury that Petitioner had to be acting with the purpose to commit a theft when he went to the Nolan household to be guilty of robbery by shooting Mrs. Nolan in the course of an attempt to commit a theft.   (Document 16 attached to ECF No. 18 at 106).

Thus, Petitioner essentially received the benefit of an explanation of what it means to attempt to commit a theft in relation to the robbery charge, and by extension, the felony murder

charge.   For this reason, the Appellate Division rejected this same argument on appeal, finding that Petitioner's argument was without merit and that Petitioner failed to establish plain error as to the jury charge.   (Document 8 attached to ECF No. 17 at 25).   In light of the extensive jury charge which explained the elements of the various crimes, the arguments of both the State and Petitioner, and sufficiently explained the elements of a criminal attempt for the purposes of the robbery charge, this Court agrees that Petitioner has failed to show that the trial court erred in charging the jury, and has certainly failed to establish plain error.   As this Court agrees that the allegedly improper charge did not amount to plain error, it certainly does not amount to the higher standard required to show that a jury charge violated due process.   *Duncan*, 256 F.3d at 203.   As such, Petitioner has failed to show that the jury charge so infected his trial with unfairness as to violate his constitutional rights, and Petitioner's argument as to the "failure" to charge attempt is insufficient to warrant habeas relief.   *Id.*

### 7.   Petitioner's ineffective assistance of counsel claims

Petitioner argues that his trial and appellate counsel were constitutionally ineffective for a variety of reasons.   The standard which governs such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).   To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.   This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."   *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . .

whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, --- F. Supp. 3d ---, ---, 2015 WL 4742380, at *3-4 (D.N.J. 2015).

Petitioner first argues that his pre-trial and trial attorneys were ineffective in so much as

they failed to call him as a witness at the *Miranda* hearing and in turn failed to call him as a witness at trial.   Petitioner likewise alleges that both counsel were ineffective for failing to investigate further and call his mother and girlfriend as witnesses at the *Miranda* hearing and at trial. Petitioner further asserts that these failures also amount to a substantive denial of his right to testify on his own behalf and his right to present a defense at trial.[4]

Petitioner bases this claim upon his assertion that he was not told he was under arrest prior to being questioned by police in February 2002.   In support of this assertion, Petitioner provides both his own insistence that he was not so informed, and affidavits from his mother and girlfriend dated June 25, 2009, in which both women assert that the police never told Petitioner he was under arrest before taking him in for questioning.   Petitioner asserts here both that the failure to call these two women amounted to ineffective assistance, and in turn that the PCR court erred in failing to hold an evidentiary hearing as to this argument.   Petitioner now asserts that this Court should not decide this matter without an evidentiary hearing.

Turning first to the question of whether a hearing is necessary, this Court finds that such a hearing is not needed to dispose of Petitioner's claims.   28 U.S.C. § 2254(e)(2) generally bars habeas petitioners from receiving evidentiary hearings where the petitioner fails to develop the factual record.   This rule does not apply, however, where the petitioner "unsuccessfully sought an

---

[4] Petitioner also attempts to argue, as stand-alone claims, that he was denied his right to testify and in turn that the trial court erred in denying his suppression motion based on the testimony of these witnesses who were not called in the trial court.   Although Petitioner presents these as stand-alone claims, they are based on arguments and purported testimony which were not before the trial court, and are only truly properly raised as parts of his ineffective assistance of counsel claims.   This Court therefore considers these two arguments, Petitioner's points eight and nine, as part of Petitioner's ineffective assistance of counsel claims rather than as truly stand-alone claims for relief.

evidentiary hearing in the PCR court and unsuccessfully appealed from the denial of his PCR petition" because in such a circumstance the failure to develop the record was not the fault of the petitioner.  *Branch v. Sweeney*, 758 F.3d 226, 241 (3d Cir. 2014).   New evidence produced in a hearing before a habeas court, however, may not be used to assess whether the state court's decision was contrary to or involved an unreasonable application of clearly established federal law.  *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011)).

In arguing that a hearing is necessary to decide his petition, Petitioner relies on *Branch* for the assertion that a petitioner who was denied a hearing in state court should receive a hearing in federal court so long as he did not fail to develop the factual basis of his claims in state court. *Branch*, however, is clearly distinguishable from the matter at hand.   In *Branch*, the facts presented at trial were clearly disputed, and the jury's decision to convict was based on a choice between two hotly contested theories of the case both of which had factual support in the trial record.  *Id.* at 239-41.   *Branch's* conviction was not based on overwhelming evidence, and the purported testimony *Branch* argued should have been raised in front of the trial court would have been clearly exculpatory, and was based on affidavits that were allegedly provided to counsel before trial.   *Id.* at 235-36.   The Third Circuit in *Branch* therefore ordered an evidentiary hearing because, based on the information then in the record, the Third Circuit reasoned that a decision as to either prong of the *Strickland* test was impossible to discern, and thus the choice of the state court not to hold such a hearing was an unreasonable application of federal law.

Petitioner's case is clearly distinguishable.   Petitioner was not tried and convicted on shaky evidence and a close call made by a jury based on strongly contested theories of the case. Petitioner was instead convicted based on the testimony of Ms. Phipps and Petitioner's own

statement to the police.   Unlike the testimony the petitioner in *Branch* sought to introduce, the testimony of Petitioner's mother and girlfriend do not go to the heart of Petitioner's case, but only have a bearing on the admissibility of his statement.   Indeed, the purported testimony of Petitioner's mother and girlfriend are directly contradicted by evidence in the record.   Not only did Detective Riley testify, both in the *Miranda* hearing and at trial, that Petitioner was repeatedly told that he was under arrest before he gave his statement, but that testimony was directly supported by Petitioner's own documentary acknowledgement that he was told he was under arrest before giving his statement.   The Third Circuit's remand in *Branch* was expressly based on the fact that neither *Strickland* prong was dispositive of petitioner's ineffective assistance claim based solely on the evidence then in the record.   *Id.* at 242; *see also Wilson v. Butler*, 813 F.2d 664, 672 (5th Cir. 1987) (remand for hearing needed where the record did not establish that Petitioner was not entitled to relief).   That is simply not the case here.

Here, the record before the state PCR court, even in the absence of an evidentiary hearing, clearly establishes that Petitioner suffered no prejudice as a result of the failure to call his mother and sister to testify at the *Miranda* hearing and at trial.   Even had these two witnesses been called, and testified to the extent provided in their certifications, the end result would not have been any different.   The only information either witness could contribute to the *Miranda* proceeding was their testimony concerning whether Petitioner was told prior to being taken into police custody that he was not under arrest and would not need a lawyer.   Neither witness could testify to what passed between Petitioner and the various officers after he was placed in Detective Riley's vehicle and taken in for questioning.   The only evidence in the record that does describe what happened after Petitioner was taken in clearly shows that Petitioner was informed that he was under arrest

36

prior to questioning and his giving a statement.   Detective Riley and the other officers who testified at the *Miranda* hearing clearly established that Petitioner had been informed that he was under arrest prior to his being questioned.   Petitioner's own statement and recognition of his *Miranda* rights clearly establishes that Petitioner was told that he was under arrest and that he was provided with *Miranda* warnings prior to his interrogation and statement to the police.   Riley's testimony that Petitioner was told, prior to being taken to Riley's vehicle, that he was under arrest further contradicts the testimony of these two purported witnesses.

Given the strong, uncontested evidence in the record which indicates that Petitioner was informed that he was under arrest and as to his *Miranda* rights prior to any interrogation by police, the testimony of Petitioner's mother and girlfriend raises no doubt that the outcome of Petitioner's *Miranda* hearing would have been any different had they testified.   As the PCR court found, the strong evidence in the record contrary to the assertions of the purported witness, coupled with the fact that both witnesses were close to Petitioner, indicates that there is no reasonable likelihood that the outcome of the *Miranda* hearing would have been any different had their testimony had been heard.   As such, Petitioner suffered no prejudice as a result of counsel's failure to call these two witnesses, and his ineffective assistance of counsel claim must fail on that ground. [5]

---

[5] As noted by the PCR court, it is also highly suspect that Petitioner's mother and girlfriend, both of whom were clearly known to Petitioner, did not sign affidavits regarding their purported testimony until 2009, several years after Petitioner was convicted.   The lateness of these affidavits raises questions regarding what information about these witnesses was before counsel at the time of the *Miranda* hearing and later at trial.   Because Petitioner did not suffer prejudice as a result of the "failure" to call these witnesses, however, this Court need not reach the question of whether counsel was deficient and therefore need not answer these questions regarding the tardiness of the statements.

Likewise, to the extent that Petitioner argues that the trial court should have suppressed his statement based on the information his mother and girlfriend could have provided, that

*Strickland*, 466 U.S. at 694; *Judge*, --- F. Supp. 3d at ---, 2015 WL 4742380 at *3-4.   Because Petitioner has failed to show that he suffered any *Strickland* prejudice, the PCR court's determination to that effect was neither an unreasonable application of clearly established federal law, nor of the facts at issue.

Petitioner's assertion that their testimony would have affected the outcome of his trial is similarly without merit.   The testimony provided by his mother and girlfriend as to whether Petitioner was told he was under arrest at trial would have been of little value to Petitioner.   That testimony, as in the *Miranda* hearing, would be directly contradicted by not only the testimony of Detective Riley, but also Petitioner's own signed statement that he had been informed he was under arrest and that he had been provided *Miranda* warnings.   Given the strength of the evidence against Petitioner, including his own statement admitting to his role in the botched robbery and shooting of Mrs. Nolan, as supported by the testimony of Ms. Phipps and the physical evidence collected from the scene, this Court finds that there is no reasonable likelihood that the testimony of Petitioner's mother and girlfriend would have had any effect on the outcome of his trial.   As such, Petitioner has failed to show *Strickland* prejudice, and his ineffective assistance claim must fail.   *Strickland*, 466 U.S. at 694; *Judge*, --- F. Supp. 3d at ---, 2015 WL 4742380 at *3-4.

Petitioner also asserts that counsel was ineffective for failing to call Petitioner as a witness during the *Miranda* hearing and at trial.   This claim, however, is directly contradicted by the two lengthy colloquies conducted by the trial court in which Petitioner specifically stated that he had

---

information was not before the trial court, and thus Petitioner essentially asserts that the trial court erred by not considering information which was not before it.   Petitioner's assertion that his mother and girlfriend's testimony indicates that the trial court should have suppressed his statement is therefore patently without merit.

no desire to testify on his own behalf.   Indeed, during the *Miranda* hearing, Petitioner's counsel specifically stated that he had fully expected Petitioner to testify, but Petitioner had at the last minute chosen, of his own accord, not to testify.   Thus, the record clearly establishes that it was not counsel's decision, but rather Petitioner's own choice which resulted in him failing to testify at both the *Miranda* hearing and at trial.   Petitioner was clearly provided the opportunity to testify if he so chose, and decided not to do so.   The record therefore clearly provides that Petitioner, after being clearly informed of his rights by the trial court chose not to testify, and that it was therefore not counsel's decision which resulted in the denial of his ability to testify on his own behalf.   To the extent that Petitioner asserts that he refused to testify because counsel was unprepared, Petitioner has provided nothing but his own assertions to support that contention. Petitioner's assertion that he chose not to testify because counsel did not call his mother and sister does not change the fact that it was Petitioner, apparently over the intentions of counsel at least at the *Miranda* hearing, who made the choice not to testify.   Petitioner has provided no evidence, other than his own bald assertions, to support the supposition that this choice not to testify was motivated by counsel's failure to call his mother and girlfriend, or failure to prepare him to testify. As Petitioner was provided with the opportunity to testify, and chose not to do so, his counsel cannot be said to have been constitutionally ineffective for failing to call Petitioner as a witness over Petitioner's own stated refusal to testify.

Petitioner also asserts that trial counsel was ineffective for failing to put on a defense.   To support this argument, however, Petitioner merely reasserts his claims that counsel failed to call as witnesses his mother and girlfriend, and likewise failed to call Petitioner as a witness.   This claim must therefore fail for the same reason that Petitioner's previous claims failed: Petitioner

has failed to show he suffered any prejudice as a result of the failure of counsel to call Petitioner's mother and girlfriend as witnesses, and Petitioner himself, rather than counsel, made the decision not to testify.   As trial counsel clearly pursued a defense that Petitioner was coerced into giving his statement at trial through cross-examination and argument during summation, and as Petitioner bases his claim that he was denied a defense by counsel solely on the "failure" to call his mother and sister as well as himself as witnesses, Plaintiff has again failed to establish that he suffered ineffective assistance of counsel.

Petitioner's final claim of ineffective assistance of counsel is based on the argument that appellate counsel failed to raise all of the claims Petitioner wished to have raised, and that counsel was allegedly deficient as a result.   It is well established, however,

> that counsel decides which issues to pursue on appeal, see *Jones* [*v. Barnes*, 463 U.S. 745, 751-52 (1983)], and there is no duty to raise every possible claim. *See id.* at 751.   An exercise of professional judgment is required. Appealing losing issues "runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." *Id.* at 753.   Indeed, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751).

*Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996).   The Supreme Court has therefore held that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."   *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

In support of his claim, Petitioner asserts only that "Appellate Counsel failed to properly raise those issues asserted herein that could have been raised on direct appeal."   (ECF No. 1 at 50).   Petitioner does not specifically identify which issues should have been raised.   As Petitioner

could not have raised the ineffective assistance arguments on direct appeal, the only arguments about which Petitioner could be arguing are the issues regarding the jury instructions Petitioner raises herein, including as to the attempt charge, the causation charge, and the renunciation charge, as appellate counsel raised all of the remaining arguments which could have been raised on direct appeal. (*See* Document 8 attached to ECF No. 17 at 3). The state courts considered all of Petitioner's arguments regarding jury instructions either on direct appeal or on PCR and found them all to be without merit. (*Id.* at 25; Document 22 attached to ECF No. 17 at 7-8). Indeed, the New Jersey Appellate Division found all of Petitioner's charging arguments to lack sufficient evidence to warrant discussion in a written opinion. (Document 8 attached to ECF No. 17 at 25; Document 22 attached to ECF No. 17 at 7-8). Thus, it is by no means clear that these arguments were stronger than those raised by appellate counsel, which warranted extensive discussion by the Appellate Division and indeed in this Court's opinion. (*See* Document 9 attached to ECF No. 17 at 10-25). As Petitioner has not even attempted to argue that these issues are stronger than those raised by counsel and discussed at length by the Appellate Division, and as it is not clear that these arguments are strong in any event having been found to lack merit by the Appellate Division, Petitioner has failed to establish that counsel was ineffective in failing to raise those claims. In any event, as those claims are state law claims which the Appellate Division rejected as without merit, it appears that Petitioner suffered no prejudice from counsel's failure to raise them at any rate. As Petitioner has therefore failed to show that he suffered ineffective assistance of counsel in that appellate counsel was not deficient and Petitioner has failed to show that either appellate, trial, or pre-trial counsel's actions resulted in prejudice to Petitioner's case, he has failed to demonstrate that the state courts' rejection of his claims were based on an unreasonable application

of federal law or the facts, and he is not entitled to habeas relief as a result.   28 U.S.C. §
2254(d)(1)-(2).


**8.   Petitioner's cumulative effect claim**

Petitioner's final argument is that even if the alleged errors raised in his petition were
insufficient to warrant relief individually, the cumulative effect of those claims warrant habeas
relief in the aggregate.   "[E]rrors that individually do not warrant habeas relief may do so when
combined."   *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007), *cert. denied*, 552 U.S. 1108
(2008).   The Third Circuit has explained that the

> standard for evaluating harmless error on collateral review is set
> forth in *Brecht v. Abrahamson*, 507 U.S. 619 [(1993)]. This is the
> standard applicable here, because "a cumulative-error analysis
> merely aggregates all the errors that individually have been found
> to be harmless, and therefore not reversible, and it analyzes
> whether their cumulative effect on the outcome of the trial is such
> that collectively they can no longer be determined to be harmless."
> *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003). Cumulative
> errors are not harmless if they had a substantial and injurious effect
> or influence in determining the jury's verdict, which means that a
> habeas petitioner is not entitled to relief based on cumulative errors
> unless he can establish "actual prejudice." *Brecht*, 507 U.S. at
> 637[; *see also*] *Whitney* [*v. Horn*], 280 F.3d [240,] 258–59 & n.18
> [3d Cir. 2002)] (Strickland prejudice and Brecht harmless error
> are essentially same standard).

*Albrecht*, 485 F.3d at 139.

Here, Petitioner's claims individually do not warrant habeas relief.   Petitioner's claims fair
no better when considered in the aggregate.   For most, if not all, of his claims, Petitioner has
failed to establish that his claims even amount to error in the first instance. Petitioner has, in any
event, also failed to establish that he suffered any prejudice as a result of the errors he asserts.

After considering all of the claims of error presented in Petitioner's petition for a writ of habeas corpus, this Court concludes that Petitioner has not established that these alleged errors, individually or in the aggregate, had a substantial and injurious effect on the outcome of his criminal matter, and as such, Petitioner has failed to establish that cumulative error requires the granting of habeas relief.   Petitioner's petition for a writ of habeas corpus must therefore be denied.

### III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right as jurists of reason could not disagree with this Court's resolution of his claims and he has not shown that the issues presented deserve encouragement to proceed further.   This Court shall therefore deny Petitioner a certificate of appealability.

**IV. CONCLUSION**

      For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED, and Petitioner is DENIED a certificate of appealability.   An appropriate order follows.


Dated: January 4, 2016                     ___*s/ Susan D. Wigenton*___
                                          Hon. Susan D. Wigenton,
                                          United States District Judge

44